The next case today is City of Miami Fire Fighters & Police Ofcs Ret Tr v. CVS Health Corporation et al. Appeal No. 211479. Attorney Lieberman, please introduce yourself for the record to proceed with your argument. Good morning, Your Honors. Jeremy Lieberman, Pomerantz LLP, on behalf of Appellants. Proceed. Thank you. Thank you, Your Honors. I'd like to reserve three minutes for a button. You may have it. Thank you. Your Honors, we submit that the District Court committed a reversible error by both dismissing the amended complaints and by denying the motion for reconsideration after the dismissal. With respect to the amended complaint and its dismissal, the District That error of law, in fact, is that the Court said that despite substantive allegations, detailed allegations regarding customer losses, we failed to quantify those losses and we failed to provide a timeline for those losses. With respect to the failure to give a timeline and quantum, it's simply incorrect. We provide detailed allegations throughout the complaints of important regions and districts where there are severe customer losses, and we provide a timeline for those losses. With respect to the customer losses... Could you help me then? Because when I read the District Court opinion and then turned to the blue brief, the first thing I thought I was going to see would be a timeline that would rebut that, and I didn't see one in your blue brief. So I looked back at the amended complaint and I found 46 paragraphs describing customer losses, but only six of them even mention any time, and the mentions of time were things like, since 2015, in 2016, etc. So I'm having trouble understanding how you're criticizing the District Court for finding that it couldn't align the customer losses, the quantity of those losses, and the making of a statement and the statement being false at the time made. Sure. Paragraph 127 discusses CW9 describing how a competitor took 10 to 15% of the LTC business of the California customers immediately after the acquisition. We have paragraph 124... Okay, so immediately... So you've got some losses immediately after that. Now, how do you align that up with a statement and falsity? Well, we don't just have that. I mean, we have several examples... No, but take that because it's got to be worth something or else you wouldn't have mentioned it. I assume it's one of your better ones. If it isn't, why don't you start with your best one? No, we have several such examples, and what we say is in light of those numerous examples, the company's statements saying that revenue was accretive as a result of the acquisition... Your Honor, I think you're on mute. I'm sorry. Answer the question. Sure. In light of this allegation regarding the California losses and others, the statements made by... But you just threw in and others. We're talking about paragraph 127, I thought, and that's talking about losses in 2015 right after the acquisition. Okay. And what's the quantity of those losses that tells us that the material and then what then is contrary to that that's stated at that time? As far as the quantity of what is 10 to 15% represents, I don't have that number for you, Your Honor. Clearly, the inference is that California was an important market for CVS and the loss of... So let's assume that that's not trivial. Then what was said at that time that was false? I thought all they said at that time was that the revenues had increased as a result of the acquisition of Omnicare units, which was clearly correct. They make those assertions that the revenues increased. They did increase, right? We don't dispute that they may have increased. What was false then? What was false is there's an overall discussion regarding revenues increasing, regarding the acquisition going well, regarding how the synergies are benefiting the company. And all the while, we have serious allegations that the company is imploding as far as LTC goes and is on its way towards a $6.1 billion impairment. Okay. So for the 127, that's one of the ones you pointed to, are you saying that they said something other than revenues are increasing that you contain, say is false? For 127, no. Revenues are... For 127, you've got at least a year, but you don't have any falsity. So take us to another one that you have a year and falsity. Okay. We have CW6 who left Omnicare in June 2016. And he says that 30% of CVS' South Florida customers had left by the time he had left the company. And so that's... So that's his testimony. He left the company in June 2016. Okay. And so then what was... So 30% in that area, and then what was false at that time? Once again, we refer to... There's an overall description regarding how revenues are accretive, how the synergies are working well for CVS, how the acquisition is going well, their ability to retain customers, an overall picture given by the company of a successful acquisition where this was nothing, where the district court itself acknowledges that this was a horrible acquisition, that this was an acquisition that was bleeding customers. And we have allegations of that right at the beginning of the class period going through the entirety of the class period. And so it's... We believe it's... Mr. Lieberman, one of the problems with sorting through your allegations is your theory that this was doomed from the start, and the company should have known that, and so the company should never have been optimistic at any point. But you see, we... That theory doesn't make a lot of sense, and so we have to look at specific losses at specific times and what specific statements were made. And so a response in these generalized terms doesn't quite do it for pointing out any error in the district court analysis. Well, we would respectfully disagree because we think the examples by 19 confidential witnesses showing massive customer losses in regions throughout the United States at that timeline starting from the beginning of the class period show significant losses with an overall impression given by the company by many different statements regarding revenues, regarding synergies, regarding their ability to maintain and attract customers. I saw you just admitted that in 2016, when the company said revenues were increasing, that was accurate. That might be factually accurate. It might be that the securities laws demand more. They demand that when you describe a business and you describe that revenues are increasing in a business, you tell the whole story that, well, revenues might be increasing now partially because they're buying new LTCs in order to cover the losses, but we have a major problem because we can't hold on to our customers. And we allege being unable to hold on to the customers through 19 confidential witnesses leading within 19 months of that point to a $6.1 billion impairment. $6.1 billion impairments don't materialize on their own. And the only warning by the company of any problem whatsoever occurs in November 2017 when they throw out three words, client retention rates. And that's the first time there's any semblance of some type of hints that there's a problem with the LTC acquisition. And we would say the allegations holistically looking at the 19 witnesses pointing to several key losses in several key regions, South Florida, upstate New York, Ohio, California, showing key losses, showing without any hint by the company that there's anything wrong And then saying in August 2018, sorry, here's a $3.9 billion impairment. And sorry, in February 2019, there's a $2.9 billion impairment. So what you've just described there is a duty to disclose case. As I understand what you just said, you're saying on a certain date, they announced an impairment of $6 billion. They should have done it sooner. They should have, when describing the state of the business, at the beginning of the class period, they should have given a full disclosure that said, while revenues might be increasing now, we are suffering severe customer losses. That's different than saying there was a fault. Oh, that's correct. You need a misleading representation. No, you need an omission. It's an omission. You need some misleading conduct by the other side. The misleading conduct can take the form of a fault statement. But under certain circumstances, it can also be as a result of not saying something. And there's a separate body of law that deal with nondisclosures. If you're making a nondisclosure case, fine. But your brief also advocated a material misrepresentation case. And that's why we were trying to line up and find out what statement was made that was wrong. And you keep answering that by saying they should have said more. Do you see the problem that creates for us in trying to understand your argument? Well, I understand. When it comes to the revenue portion, then that is an omission argument. They're describing increasing revenues, but they're not describing a serious threat to those revenues going forward, which is that they're hemorrhaging customers. When we discuss synergies, which in that situation, we discussed straight out synergies where that was false and misleading. We have several examples of synergies that were simply failing throughout the class period, be it that they treated the Omnicare like a big box pharmacy, be it that they had very few attorneys to negotiate contracts, be it that they got rid of their Toledo distribution center and distributed medicines through their pharmacies, which delayed. So I can understand that the synergies goes to the omission. But if you're back on the untrue statements, what particular statements, at what time, and what evidence of material losses that are tied to those statements? First, which are you arguing? We have statements regarding synergies. We have statements we began to realize some of the antecedents. Are you arguing synergies as part of your omission case, or are you arguing synergies as part of your material misstatements of fact case? The synergies would be both a material misstatement of facts and also the omission as well. Okay, so let's put omission to the side. As to the material misstatements of fact, again, what were the statements, at what time, and what is the evidence tied to it of material losses? Okay. With respect to synergies, you have, starting at the first quarter of 2016, the company saying we began to realize some of the anticipated synergies. We have the company saying this program continues to grow, and we now fill nearly half of all emergency scripts using a CVS pharmacy. They say that residents enhanced prescription delivery options were created by the CVS acquisition. And they say that through our national CVS pharmacy network, we're able to fill emergency or stacked scripts for skilled nursing facilities much more quickly in urgent solutions. And what we say is that we have a host of allegations by the CWs that say that the synergies were failing. That's time. As of 2016, when this statement was made. Well, just like the customer losses, as of immediately after the acquisition, as of 2016, and then as of 2017. There's a whole discussion in paragraph 142 to 158 discussing how the synergies failed. And the court made an error of law there because what the court said was, the court said these were statements of opinion. Saying that your synergies are working and executing are not statements of opinion. Those are statements of fact. Okay. Thank you. You have some time reserved. Thank you, Attorney Lieberman. Please mute your audio and video at this time. Attorney Farina, please introduce yourself on the record to begin. May it please the court. Steve Farina from Williams & Connolly on behalf of Appalese. The district court here properly found, applying settled first circuit law, that there was no false or misleading statement made by the defendants. The court took a thorough review of the disclosures that were actually made, not the plaintiff's characterization of those disclosures. And found that because the problems with customer retention were disclosed by the defendants, there was no obligation to disclose more than what was stated. And critically, she found that no reasonable investor could have believed that the issues plaintiff's claim were omitted did not exist. Fairly read, the plaintiff's complaint, when stripped of hyperbole and adjectives, is that CVS was losing customers during the class period. They do not specify when during the class period those losses became material. The CWs do not do that. CVS, during the class period, disclosed that they were facing customer retention issues. And critically, that those customer retention issues were negatively impacting the long-term care business. Yes, but you're doing the same thing. You're giving us a two-year period of time and saying there was a disclosure made. If it was made on the next to last day of the class period, I think it hardly helps you. Sure. Let me address that. First of all, in the 2015 Form 10-K, which begins the class period, the risk factors in the 10-K specifically identify LTC client loss and or the failure to win new LTC business as a risk. In the 2016 Form 10-K, that risk disclosure is expanded to specifically address integration. It says we may be unable to successfully integrate companies acquired by us and that potential difficulties with integration could include retaining existing customers and attracting new customers. Okay, but you've just identified two respects in which the filings identified risk. I think the argument is that the risk came home to roost and, in fact, you were suffering those integration problems. That's different than saying there's a risk we could have it. On the other hand, it's saying we do have it. Absolutely, Your Honor, and that is exactly why CVS changed its disclosures. Throughout the class period, the disclosures changed over time as the awareness of issues by management changed. In the third quarter of 2017, so halfway through the class period, there is a specific disclosure talking about the value of the long-term care business and whether or not that value may be impaired. Critically, the plaintiffs do not challenge the accounting of the value of the long-term care unit. In their complaint, they addressed whether or not the impairment should have been taken sooner, but in their opposition to the motion to dismiss, they unequivocally abandoned that argument and said they are not challenging the accounting. They are not saying and cannot say that the financial statement impact of the client losses, the vague client losses that they allege, had any impact on the value of the long-term care unit beyond what was disclosed by CVS. In the third quarter of 2017, CVS disclosed that the multi-year cash flow projections for the long-term care unit were being negatively impacted by client retention rates and went on to say specifically that because of this, the performance of the LTC reporting unit could fall below expectations and that would result in a material impairment of the goodwill associated with that unit. That warning was repeated again in the following quarter and then in the first quarter of 2018, CVS disclosed our long-term care reporting unit continues to face challenges. These challenges included client retention rates and again warned that if these challenges continue, there could be a material impairment. In the very next quarter, CVS disclosed during 2018, the long-term care reporting unit has continued to experience challenges and then took the $3.9 billion impairment. This is within the class period, so the disclosures are evolving as the information available to CVS evolves. Those are disclosures made during the class period. The complaint does not sufficiently identify that the facts at any particular point in time were sufficient that they warranted disclosures different than the ones that CVS made. What do you say they point to statements made by CVS regarding benefiting from synergies created by the acquisition? Their argument is from day one, there were no positive synergies at all. That's just false. I don't think fairly read that's what their CWs even allege. What the CWs allege is not that there weren't synergies. What they're alleging is that the synergies were causing customer losses. All of their allegations at the end of the day come down to customer losses, which they acknowledge were disclosed. The litany of synergies that counsel just read, there's no allegation that those specific synergies weren't occurring. For example, that prescriptions weren't being filled by CVS retail pharmacies. What they're alleging is that customers were unhappy with how CVS was managing Omnicare including the synergies and therefore they were losing customers. CVS disclosed customer losses and specifically disclosed the impact the customer losses were having on the value of the long-term care business. That was during the class period. This is nothing like any securities case that I have found that has withstood scrutiny in the first circuit. There's always a statement that is at odds in some material way with the facts that are alleged. Here, the facts that are alleged is that CVS was losing customers and that's what the disclosure said. You described synergies as having a negative effect. I thought synergy by definition referred to when you combine two elements, you get a result that's greater than the sum of the two. Absolutely. They're saying when you combine these two elements, you got a result that was lesser than the sum of the two. I think the allegation fairly read is that the things that CVS was doing to combine the two, the customers did not like and therefore it was affecting customer retention rates. I don't think that there is an allegation in the complaint that the synergies were not put in place or that the synergies were not, for example, saving expenses. The allegation is that the customers simply didn't like the synergies and therefore they were leaving CVS. They don't specify at what point in time any of those losses became material. This is a business that fills 26 million prescriptions at the beginning of the class period. You're going to expect that customers will turn over, that you will lose some customers, you will gain some customers. So identifying specific losses of specific customers is not sufficient to tell you that the business is collapsing or that the company is hemorrhaging customers. What we do know is that during the class period, CVS disclosed that there were customer losses and that those losses were sufficient enough that it was having a negative impact on the business and that if those challenges, customer retention rates continued, there could be a material devaluation of the long-term care unit. That is exactly what CVS did during the class period. We haven't talked about Scienter. Scienter is obviously an element. There's no allegation that would support a compelling inference of Scienter here. This court has repeatedly said that when you actually make disclosures, it undercuts an inference of Scienter. The plaintiff's theory of Scienter here is that CVS was attempting to protect the Aetna merger that occurred at the end of 2017 by concealing the performance of the long-term care business. But that is exactly the time period when CVS started to amplify its disclosures about the problems with the long-term care business. There's no evidence in the first half of the class period that would support an inference of Scienter. Council, let me, since you're mentoring Scienter, I believe it's paragraph 214 approximately of the amendment of the complaint and maybe prior, before or after. But there is a chart there and there are allegations, at least alleged within the chart, that there were insider sellers such as Merlo, Denton, Roberts. Wouldn't that – what would you respond to that? Doesn't that go to Scienter or still has no effect on the overall allegations in the complaint? Well, this court has said that insider trading in and of itself is not sufficient, but it is probative of Scienter. And we addressed that in our brief. There are five individuals. As to two of the individuals, there's no allegation about trading. As to the third individual, there's not even an allegation that the trading was suspicious. But for the two individuals as to whom they claim that there was suspicious trades, the holdings of those individuals increased during the class period. And this court on multiple occasions has specifically held that an increase in ownership during the class period undercuts an inference of Scienter rather than supports one. So yes, there were sales. It's a three-year class period. The fact that there were sales is hardly unsurprising. But as this court has specifically found, where you have the holdings increasing during the class period, that is not probative of Scienter. It actually undercuts an inference of Scienter. Their overall theory, though, about why there was a fraud here is that CVS was trying to protect the Aetna merger. The Aetna merger closed at the end of 2018, and it was signed up at the end of 2017. It is a theory that is built on speculative inference upon speculative inference. The CWs say literally nothing about the Aetna merger. The CWs say literally nothing about the company's disclosures. The CWs say literally nothing about the company's accounting. All the CWs support is an inference that during this three-year class period, CVS lost customers in the long-term care unit. That is entirely consistent with the disclosures that CVS made. That is not securities fraud under this court's settled law. The notion that CVS was somehow obligated to use words like the company was hemorrhaging customers or that the business was collapsing, there is nothing in the securities laws that compels the use of that pejorative negative language. The plaintiffs acknowledge that CVS made disclosure of customer retention issues, and they say that those disclosures are euphemistic and anodyne. But again, that is not securities law in the First Circuit. A disclosure is a disclosure, and you do not need to use the pejorative dramatic hyperbolic language that the plaintiffs suggest in their briefing, and their complaint should have been used. As to the court's decision not to allow amendment, I will address that only very briefly. The plaintiffs here did not follow the procedure that this court repeatedly has admonished plaintiffs to follow. They did not seek amendment at the correct time. They did not seek amendment using the correct vehicle, and the court was well within its discretion to leave to amend post-judgment. The plaintiffs here had ample opportunity. They had almost two years from the filing of their amended complaint to when the court dismissed the action to seek amendment to add any additional evidence that they wanted to add. They did not do so. They made the tactical choice that this court repeatedly has told plaintiffs that they cannot make, which is to wait and see if the complaint would survive a motion, and if it did not, then to seek amendment. And that tactical choice failed here because the original complaint did not adequately state a claim, nor frankly does the proposed second amended complaint. Thank you. Thank you, Your Honor. Attorney Farina, if you had nothing further, you can mute your audio and video at this time. And, Attorney Lieberman, you have a three-minute rebuttal. Please introduce yourself back on the record to begin. Sure, Your Honor. It's Jeremy Lieberman again from Pomerantz. Just to address some of the comments made by my friends, with respect to the issue regarding disclosure, and Mr. Farina's comment that full disclosure was made by defendants were just picking on the adjectives, it was simply not accurate. The first time there's any issue raised regarding client retention is 19 months into the class period, at the same time the first alleged corrective disclosure. That's the first time there's any hint to the market that there's a problem retaining customers and clients. To that point, it's simply not raised. There is at no point during the class period, and this court didn't even address this argument, was there an issue raised regarding operational issues. At the end of the class period in February 2019, CVS said that one of the reasons for the ultimately $6.1 billion of impairments was there were operational issues. There was no disclosure at any time that there were any operational issues with respect to the Omnicare acquisition. At all the same while, the company is making statements regarding their ability to attract and retain customers. That's a statement made throughout the class period. The district court held that those are forward-looking statements. They're not forward-looking. The Carbonite case makes clear in the First Circuit that when you're speaking about a forward-looking statement, it needs to be done in the future tense. There's nothing forward-looking about our ability to maintain and attract customers. They're actually hemorrhaging customers, 10% to 15% of the market in California, 30% in South Florida, all by 2016. Sorry. How do you respond to the point that these losses that you refer to, you haven't shown that they were material enough to trigger particularly an affirmative duty to disclose, if there's no evidence that the accounting in general or the accounting's valuation of the goodwill was misleading at any point? You would look at the inferences of the 19 witnesses talking about massive customer losses throughout the entire United States, and then you'd also look at the fact that within 19 months, the company was warning and making severe impairments. One does not make a $6.1 billion impairment overnight. The business gradually erodes over a course of time, as stated by the amended complaint. Take December of 2016. If the accounting and the attribution of goodwill was correct at that point, and the business was properly valued, including the goodwill component, then doesn't that just tell us that, well, there were losses, but there were synergies and reduced expenses, and maybe they gained something? How do you get materiality out of that? You have 19 witnesses talking about massive losses. In 19 winters, they used the word massive. We're talking about materiality. If there were material losses, wouldn't that mean the goodwill was inaccurate? It would be, but we don't have enough to allege on the goodwill itself that it was inaccurate because we didn't do the impairment analysis. We don't have those documents. Actually, the Cabletron case makes clear that you look at the… You want us to find that there was, in fact, impairment that should have been disclosed. No, no. We want this court to find there was an omission. When you're discussing that there's no impairments, there's an omission that despite that lack of impairments, there's massive customer losses that may very well likely trigger an impairment. I want to briefly address the amendment issue because… All right. Just a moment. Judge Kayada, do you have any further question on that? No. All right. You get 30 seconds. On the amendment, this court and the district court below has been pressing continuously on it. We need a timeline. We have a timeline now in the PSAC. In 2016, CW25 says that 25% of the business had been lost immediately after the acquisition, and 50% was lost by July 2018. It is standing right in front of everyone's face, the amendment that can cure this issue. That would be manifest injustice not to allow amendments when we know the investors can recover their losses here and get a recovery under the securities laws if we would simply allow them the opportunity. Your time is up. Judge Halby, do you have any questions? My only question along these same lines counsel was arguing. Why didn't you seek to amend before the dismissal because that's the norm? We had just interviewed in February and March of 2021, CW21, 23, and 25 that provide these critical allegations. There's nothing on the record saying we had an ability beforehand. Our investigators were consistently working on the case, and this is when we found that evidence, and immediately upon finding that evidence, we saw a need to amend. And that amendment would cure everything we're speaking about today. Okay. Thank you. That's enough. Okay. Thank you very much. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the meeting.